2019 UT App 86

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTHONY TYRONE LANE,
Appellant.

Opinion
No. 20160930-CA
Filed May 23, 2019

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 161901895

Teresa L. Welch, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER concurred.
JUDGE RYAN M. HARRIS concurred, with opinion.

APPLEBY, Judge:

¶1 Anthony Tyrone Lane appeals his convictions for aggravated assault and possession of a dangerous weapon by a restricted person. He argues the district court erred in applying the doctrine of chances and improperly admitted prejudicial prior act evidence. He also argues his trial counsel was ineffective for failing to request the trial court judge's disqualification based on remarks she made during a pretrial hearing. We reject Lane's ineffective assistance of counsel claim but conclude the prior act evidence should have been excluded and therefore remand for a new trial.

BACKGROUND

¶2     Lane lives in Salt Lake City.[1] In February 2016, he was in a physical altercation with the victim (Victim) at a homeless shelter. Lane was arrested and charged with aggravated assault and possession of a dangerous weapon by a restricted person. Trial was held in August 2016.

¶3     Victim was the first witness to testify. Victim previously lived at the shelter and returned there that day to pick up mail. After realizing the mailroom was closed, he wandered around talking to people. There were "50 to 100 people milling around" the shelter, including Lane. Victim testified that as he was talking, he "got side blinded, got punched in the face and . . . just started swinging back at the direction that it came from." Several people broke up the fight. Victim "took a few steps" back and "then it started up again." Victim testified he got punched again, "went down to duck a punch," and when he came back up, he "was bleeding." He thought he had just been punched but guessed he "ended up getting sliced." Victim sustained three lacerations to his face as a result of the incident. Lane ended up with a small cut on his finger. Victim denied using a knife in the altercation and denied having one.

¶4     The State presented surveillance footage of the incident. At first, Victim could not identify himself on the video recording and testified he was unsure with whom he was fighting. Victim added that it was "hard to see" what was going on in the footage. He testified multiple times he did not know who hit him. After the altercation, Victim left the scene to try to catch a train to a hospital. He was bleeding severely and had a towel on

---

1. "On appeal, we recite the facts in the light most favorable to the jury's verdict." *State v. Martinez*, 2013 UT App 154, ¶ 2 n.1, 304 P.3d 110.

his face when he was stopped by a security officer. Police officers arrived and called for an ambulance. Victim was treated at a hospital for his injuries.

¶5    A witness (Witness) to the altercation also testified. Witness was a shelter resident who saw Lane and Victim "get into an altercation" and then being "pulled apart." He testified he saw Lane "excuse[] himself," but then "they got into [a] second altercation [and he] noticed both of them had blades." "A crowd was following them," and "when [Lane] left and [Victim] pursued," the crowd "let them get into it again." Witness saw Lane "sidestep [Victim] and throw a punch back at him." Witness testified that Lane "clearly took off . . . [and] was trying to avoid that whole mess."

¶6    One of the responding officers (Officer) also testified. Officer commonly patrols the shelter and considers it a "high crime area." He investigates "anywhere from 15 to 30" incidents a day, ranging from "drug crimes on up to pretty serious cases." He testified that it is "not uncommon for people to have guns and all sorts of other things down there." He arrived on the scene and Victim told him that he challenged Lane first for "being a big mouth" and "acting tough." When shown footage of the incident, Officer testified he "couldn't tell a whole lot from the surveillance video."

¶7    The second day of trial primarily consisted of testimony regarding two prior incidents involving Lane. Before trial, the State filed a motion asking the court to admit evidence of incidents that occurred at the shelter in 2012 (2012 Incident) and 2015 (2015 Incident). The State sought to introduce the evidence under rule 404(b) of the Utah Rules of Evidence or, in the alternative, the doctrine of chances. The State argued that these incidents were offered for a proper non-character purpose under rule 404(b) to show "intent, plan, absence of mistake, motive, lack of accident, and to rebut [Lane's] self-defense claim."

Specifically, the State argued that "the prior bad act evidence will prove [Lane assaulted Victim with unlawful force or violence] by showing that [Lane] knew what he was doing when he assaulted [Victim] with a sharp object, that he had a plan and motive to injure [Victim], and that he was not acting in self-defense." The State also argued this evidence was relevant and that the probative value was not substantially outweighed by unfair prejudice.

¶8     In the alternative, the State argued the evidence should be admitted under the doctrine of chances. The State contended "the evidence of [Lane's] two prior bad acts [was] offered to counter his claim of self-defense in the current case" and to "show that it is unlikely that [he] would be placed in a situation three times in four years that would require cutting the victims' faces in self-defense." The State claimed it was not "assert[ing] that [Lane] has a propensity for cutting faces." The State argued that the evidence was relevant, it was being offered for a proper non-character purpose, and its probative value substantially outweighed its prejudicial effect.

¶9     The district court ruled that the two prior incidents involving Lane were admissible under the doctrine of chances because the foundational requirements were met (that is, materiality, similarity, independence, and frequency). The court admitted the evidence of the two incidents on this ground but did not evaluate it under rule 403.

¶10    At trial, the following evidence was presented regarding the 2015 Incident. A woman (2015 Witness) who once lived at the shelter testified first. She testified that the altercation began with Lane arguing with a man and Lane was "as always . . . letting him know who he was." 2015 Witness testified that after the two stopped yelling Lane walked away, then returned and "slashed" the man in the face. She testified the other man did not have a weapon. After that, 2015 Witness approached the man

and put a shirt on his face and waited for medical assistance. After 2015 Witness was excused, the court—without prompting from the parties—reminded the jury that the "last witness has to do with a separate incident from the one we talked about yesterday. And witnesses from here on out are separate, right? 2015 instead of 2016."

¶11 A responding officer (2015 Officer) also testified about the 2015 Incident. He was patrolling the shelter that day and separated Lane from a man with whom Lane was arguing. A few minutes after separating the men, 2015 Officer was called to respond to a "fight with a knife." As 2015 Officer approached, he saw a man "being attended to by several other individuals . . . [and 2015 Officer] could see blood seeping through [a] cloth [held to the man's face]. There was blood on the ground and then also blood on the [man's] shirt." The individuals attending to the man told 2015 Officer that Lane cut him.[2] When 2015 Officer encountered Lane after the incident, Lane told 2015 Officer "it was self-defense." Another responding officer testified that officers seized a box cutter from Lane. The other man was transported to the hospital for a "deep laceration" on the left side of his face "starting just above the ear and continuing all the way down to the corner of his mouth." Lane was later charged with assault in connection with the 2015 Incident. The case went to trial and a jury found Lane not guilty.

¶12 The State next introduced evidence from the 2012 Incident. A responding officer (2012 Officer) was called to the shelter on a report of a "man with a knife." 2012 Officer "noticed [Lane] bleeding from the mouth, [and it] looked like he'd been involved in an altercation." 2012 Officer observed a knife

---

2. Defense counsel objected to this statement as hearsay and the court sustained the objection but did not instruct the jury to disregard the statement.

approximately seven to eight feet away from Lane that was "silver in color, had a wooden handle, [and] about a 4-inch blade." Lane told 2012 Officer the knife was his. 2012 Officer could not recall whether there was blood on it. He testified Lane was the only individual bleeding. A second officer testified that Lane said the man he was fighting with "struck him with a head-butt and then punched him and then [Lane] drew a knife." Lane claimed he produced the knife in self-defense. He pled guilty to assault for the 2012 Incident.

¶13    At the conclusion of trial, the jury convicted Lane of two felony charges: aggravated assault and possession of a dangerous weapon by a restricted person. The court sentenced Lane and he appeals.

ISSUES AND STANDARDS OF REVIEW

¶14    Lane raises two issues on appeal. First, Lane contends the district court improperly applied the doctrine of chances analysis in admitting evidence of the 2012 and 2015 incidents. "The appropriate standard of review for a district court's decision to admit or exclude evidence is abuse of discretion." *State v. Lowther*, 2017 UT 34, ¶ 17, 398 P.3d 1032 (quotation simplified). "A district court abuses its discretion when it admits or excludes evidence under the wrong legal standard." *Id.* (quotation simplified). Reversal is warranted if "absent the error, there was a reasonable likelihood of a more favorable result for the party," and therefore "our confidence in the jury's verdict is undermined." *Robinson v. Taylor*, 2015 UT 69, ¶ 39, 356 P.3d 1230 (quotations simplified).

¶15    Second, Lane contends his trial counsel was ineffective for failing to request the trial judge's disqualification based on remarks she made to him during a pretrial hearing. "An ineffective assistance of counsel claim raised for the first time on

appeal presents a question of law." *State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344 (quotation simplified).

ANALYSIS

I. Prior Act Evidence

¶16 Lane argues the district court improperly applied the doctrine of chances in admitting evidence of the 2012 and 2015 incidents. Specifically, Lane contends the court erred in admitting the prior act evidence under rule 404(b) without also weighing it under rule 403. We agree.

¶17 It is "fundamental in our law that a person can be convicted only for acts committed, and not because of general character or a proclivity to commit bad acts." *State v. Reed*, 2000 UT 68, ¶ 23, 8 P.3d 1025. This concept is articulated in rule 404(b) of the Utah Rules of Evidence, which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2).

¶18 The "doctrine of chances" is also used to admit otherwise excludable prior act evidence under rule 404(b). It is "a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. This evidence is used in cases that involve "rare events happening with unusual frequency." *State v. Lopez*, 2018 UT 5, ¶ 52, 417 P.3d 116. Evidence admitted under the doctrine of chances must satisfy four foundational

requirements.[3] *Verde*, 2012 UT 60, ¶ 57. "These . . . include materiality, similarity, independence, and frequency." *State v. Lomu*, 2014 UT App 41, ¶ 28, 321 P.3d 243 (citing *Verde*, 2012 UT 60, ¶ 5).

---

3. In *State v. Lowther*, the Utah Supreme Court clarified confusion over whether the doctrine of chances requirements should be assessed as elements under rule 404(b) or as factors replacing the *Shickles* factors under rule 403. 2017 UT 34, ¶ 21, 398 P.3d 1032.

In *State v. Shickles*, the supreme court articulated a set of factors district courts should consider in conducting a rule 403 balancing test prior to admitting 404(b) evidence. 760 P.2d 291, 295–96 (Utah 1988), *abrogated by State v. Doporto*, 935 P.2d 484 (Utah 1997). In *State v. Verde*, 2012 UT 60, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, the court articulated a different set of factors courts should consider for the doctrine of chances but it was unclear whether those factors were intended to replace the *Shickles* factors under rule 403. *See State v. Lowther*, 2015 UT App 180, ¶ 25, 356 P.3d 173 ("Given this court's decision in *State v. Labrum*, to interpret *Verde* as replacing *Shickles*, the trial court's strict adherence to *Shickles* is misplaced."), *aff'd on other grounds*, 2017 UT 34, 398 P.3d 1032. The supreme court clarified in *Lowther* that district courts should not "make a mechanical application" of any factors but should simply "apply the text of rule 403." 2017 UT 34, ¶ 33 n.51. Specifically, the court held that "in performing a rule 403 balancing test, a court is not bound by [*Verde*'s] foundational requirements" and can consider any relevant factors in applying the text of rule 403. *Id.* ¶ 21.

But it has always been clear that traditional balancing of probative value and prejudicial effect under rule 403 is required prior to admitting 404(b) evidence. *See, e.g., State v. Thornton*, 2017 UT 9, ¶ 36, 391 P.3d 1016; *Verde*, 2012 UT 60, ¶ 15; *State v. Lomu*, 2014 UT App 41, ¶ 33, 321 P.3d 243; *State v. Labrum*, 2014 UT App 5, ¶ 18, 318 P.3d 1151.

¶19    The difficulty in applying rule 404(b) "springs from the fact that evidence of prior bad acts often will yield dual inferences." *Verde*, 2012 UT 60, ¶ 16. "[E]vidence of a person's past misconduct may plausibly be aimed at establishing motive or intent, but that same evidence may realistically be expected to convey a simultaneous inference that the person behaved improperly in the past and might be likely to do so again in the future." *Id*. "If such evidence is really aimed at establishing a defendant's propensity to commit a crime, it should be excluded despite a proffered . . . legitimate purpose." *Id.* ¶ 17 (quotation simplified).

¶20    If a court finds a proper non-character purpose for the evidence, it must also engage in a separate rule 403 analysis to weigh these competing concerns. *Id.* ¶¶ 17–18. Weighing this evidence is "essential to preserve the integrity of rule 404(b). Without it, evidence of past misconduct could routinely be allowed to sustain an inference of action in conformity with bad character—so long as the proponent of the evidence could proffer a plausible companion inference that does not contravene the rule." *Id.* ¶ 18.

¶21    For purposes of our analysis we assume, without deciding, that the evidence in this case was admissible under rule 404(b).[4] In its ruling, the district court correctly articulated the standard for admitting prior act evidence. First, a court must determine whether the evidence is offered for a proper non-character purpose. Next, a court must find that the evidence's "probative value is not substantially outweighed by the danger of 'unfair prejudice, confusing the issues, misleading

---

4. Lane does not ask this court to find that the doctrine of chances should not be used to rebut a defense of self-defense. But, as the concurring opinion points out, we have our doubts that it should be applied in this context.

the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" (Quoting Utah R. Evid. 403.) But despite articulating the proper standard, the court failed to apply rule 403 when it found the 2012 and 2015 incidents admissible under the doctrine of chances.[5] Its analysis simply consisted of mechanically applying *Verde*'s foundational requirements under rule 404(b). *See State v. Lowther*, 2017 UT 34, ¶ 1, 398 P.3d 1032 (holding that the district court abused "its discretion by mechanically applying the *Shickles* factors to assess the probative value of the State's rule 404(b) evidence"). In other words, the court applied the wrong legal standard in admitting this evidence by not conducting a separate rule 403 analysis. This amounts to an abuse of discretion. *See id.* ¶ 17.

¶22 Courts must "carefully consider whether [prior act evidence] is genuinely being offered for a proper, non-character purpose, or whether it might actually be aimed at sustaining an

---

5. Rule 403 balancing is always required before admitting evidence under rule 404(b). *See Lomu*, 2014 UT App 41, ¶ 33 ("Having taken all of the *Verde* requirements into account and having determined that there was substantial probative value in admitting evidence of the other episode, we *must also* consider whether the potential for prejudice or confusion from admitting the evidence substantially outweighed its probative value." (emphasis added)); *Labrum*, 2014 UT App 5, ¶ 18 ("Evidence offered under rule 404(b) is admissible if it is relevant for a non-character purpose *and* meets the requirements of Rules 402 and 403." (emphasis added) (quotation simplified)); *see also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 203 (2018–2019 ed.) ("Rule 403 codifies the common law authority of the judge to balance the probative weight of *any item* of evidence against its overall unfairness. If a drafter were required to reduce all the rules of evidence into two rules, it would be rules 402 and 403." (emphasis added)).

improper inference of action in conformity with a person's bad character." *Verde*, 2012 UT 60, ¶ 18. "[E]ven if the evidence may sustain both proper and improper inferences under rule 404(b)," courts must "balance the [inferences] against each other under rule 403, excluding bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *Id.* As we articulated *supra* ¶ 18 note 3, courts should not "make a mechanical application" of any factors under rule 403 but should simply apply the text of the rule. *Lowther*, 2017 UT 34, ¶ 33 n.51.

¶23　In this case, the prior act evidence should have been excluded because the prejudicial inference that Lane's character predisposes him to get in knife fights and then claim self-defense substantially outweighs the State's proffered justifications for admitting the evidence. The State claimed it was offering the evidence to show Lane's "non-character purpose of intent, plan, absence of mistake, motive, lack of accident, and to rebut [his] self-defense claim." Specifically, the State argued the evidence would prove Lane's unlawful use of force or violence "by showing that [he] knew what he was doing when he assaulted [Victim] with a sharp object, that he had a plan and motive to injure [Victim], and that he was not acting in self-defense, but that he was, in fact, the actual aggressor." The State also argued the evidence should be admitted under the doctrine of chances. It argued that the prior act evidence shows that "it is unlikely that [Lane] would be placed in a situation three times in four years that would require cutting the victims' faces in self-defense." The State claimed it was not asserting that Lane "has a propensity for cutting faces."

¶24　Merely stating that evidence is not being offered for propensity purposes does not mean the evidence does not present an improper propensity inference. First, it is not highly strange or unlikely that Lane would need to defend himself

multiple times over years of living in a high crime area. Officer testified at trial that he encounters many individuals carrying weapons in that area and responds to "15 to 30" incidents a day ranging from "drug crimes" up to "pretty serious cases." Further, the proffered use of the evidence presented by the State is substantially outweighed by the unfairly prejudicial inference that Lane has the character of someone who continuously provokes altercations, cuts the faces of his victims, and then claims self-defense.

¶25   The way the evidence was presented at trial also supports our conclusion that the prior act evidence in this case presented a prejudicial propensity inference. In opening statements the State told the jury how to view the prior act evidence. "We're here today on an aggravated assault case so I want to tell you a little bit about that. In [2015], prior to the incident in 2016 that we'll be trying over the next two days, the defendant got into an argument with an individual." The State continued,

> [Lane] pulled out a box cutter and sliced . . . [the individual] across the face, opening his cheek. When [Lane] was arrested . . . he said he was only defending himself, it was self-defense. But then he said he would do it again. And that is why we are here today for this 2016 case because he did exactly what he said he was going to do. *He did it again*.

(Emphasis added.) The statement that Lane "did it again" is precisely the type of propensity inference rule 404(b) prohibits. *See* Utah R. Evid. 404(b) ("Evidence of a crime . . . is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."); *State v. Burke*, 2011 UT App 168, ¶ 28, 256 P.3d 1102 (holding "evidence of a defendant's bad acts is not admissible to prove that a defendant has a propensity for bad behavior and has acted in conformity with his dubious character"); Edward J.

Imwinkelried, *Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances as a Justification for Introducing Uncharged Misconduct Evidence to Prove Intent*, 45 Hofstra L. Rev. 851, 856 (2017) [hereinafter Imwinkelried] ("It is axiomatic that the jurors may not reason that the other act shows the accused's bad character and that 'if he did it once, he did it again.'").

¶26 Next, we address whether admitting the prior act evidence was prejudicial to the outcome of trial. The evidence presented at trial for Lane's 2016 charges, standing alone, was weak and based on circumstantial evidence. Victim never identified Lane as his attacker, none of the police officer witnesses saw the incident, and the defense witness testified he saw Lane "trying to avoid that whole mess" and that "both [Lane and Victim] had blades." Also, the surveillance footage from 2016 was blurry and it was "hard to see" what occurred.

¶27 The prior act evidence also took up a significant portion of the two-day trial. The State finished presenting its evidence of the 2016 charges on the first day and spent most of the second day presenting the prior act evidence. Further, at the beginning of the second day, after the first witness testified regarding the prior act evidence, the court sua sponte addressed the jury to remind it that the State was no longer presenting evidence of Lane's 2016 charges. Based on how the evidence presented at trial, it was possible that Lane's conviction "reflected the jury's assessment of his character, rather than the evidence of the crime he was charged with." *State v. Rackham*, 2016 UT App 167, ¶ 24, 381 P.3d 1161. Because the 2016 evidence was weak and the prior act evidence took up a significant portion of the trial, "the likelihood of a different outcome in the absence of the rule 404(b) evidence . . . is sufficiently high to undermine confidence in the verdict." *Id.* (quotation simplified).

¶28 We also note that the jury instruction does not cure the prejudice in this case. The stipulated instruction states,

> You have heard evidence that [Lane] brandished a knife in a fight and that he cut an individual's face with a box cutter. Both of these acts occurred before the acts charged in this case. You may consider this evidence, if at all, for the limited purpose of self-defense. This evidence was not admitted to prove a character trait of the defendant or to show that he acted in a manner consistent with such a trait. Keep in mind that the defendant is on trial for the crimes charged in this case, and for those crimes only. You may not convict a person simply because you believe he may have committed some other acts at another time.

The State argues any improper use of the 2012 and 2015 incidents at trial was cured through this instruction. We disagree that this instruction properly informed the jury on how to use the evidence from the 2012 and 2015 incidents. *See* Imwinkelried at 878 (noting that the risk of unfair prejudice can be minimized by a "clear [and] forceful limiting instruction"). The instruction tells the jury it is allowed to consider the 2012 and 2015 incidents for "self-defense" but at the same time it is not allowed to "convict a person simply because you believe he may have committed some other acts at another time." This seems to tell the jury it is allowed to consider Lane's propensity for getting in fights and arguing he was acting in "self-defense" while simultaneously telling it not to convict Lane because he may have been in fights before and then claimed "self-defense."

¶29 We conclude that the prior act evidence should have been excluded before trial under rule 403 and, had it been excluded, there is a "reasonable likelihood of a more favorable result." *Robinson v. Taylor*, 2015 UT 69, ¶ 39, 356 P.3d 1230 (quotation simplified).

## II. Trial Judge Disqualification

¶30   Lane also contends his counsel was ineffective for failing to request the judge's disqualification because of remarks she made to Lane during a pretrial hearing. We disagree.

¶31   To succeed on his ineffective assistance of counsel claim, Lane must show "(1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's performance there is a reasonable probability that the outcome of the trial would have been different." *State v. Montoya*, 2004 UT 5, ¶ 23, 84 P.3d 1183 (quotation simplified). "To prevail on the first prong of the test, a defendant must identify specific acts or omissions demonstrating that counsel's representation failed to meet an objective standard of reasonableness." *Id.* ¶ 24 (quotation simplified). Lane fails to meet the first prong in this case.

¶32   During a pretrial hearing Lane's counsel asked the court to release Lane from jail pending trial. The State opposed his release arguing that the allegations of the current charges along with "his criminal history . . . show[s] that he is a danger to the community" and that "he could potentially be a flight risk." In response the judge stated, "What concerns me is the difficulty with the self-defense claim when you are the one introducing a weapon into a fight. Even if someone else starts that fight, you then can't introduce a weapon into that fight. . . . That's what makes you a danger to society." The judge concluded, "I am not inclined to do a release at this time, not after I've looked at the slashed faces of people you've had contact with."

¶33   The court found Lane was "a danger to society" in the context of considering whether to release him before trial. The court was not, as Lane argues, making a premature

determination of his guilt,[6] but merely engaging in routine and necessary analysis for purposes of determining his pretrial release status. *See State v. Kucharski*, 2012 UT App 50, ¶ 4, 272 P.3d 791 ("The fact that a judge has formed an opinion regarding a particular defendant based on proceedings occurring in front of the judge is not a ground for disqualification." (citing Utah Code of Judicial Conduct rule 2.11(A))); *see also id.* ("[B]ias or prejudice requiring disqualification must usually stem from an extrajudicial source, not from occurrences in the proceedings before the judge." (quotation simplified)).

¶34 We conclude these statements do not establish that the judge was biased and therefore Lane's trial counsel was not ineffective for not requesting the judge's disqualification. *See State v. Tueller*, 2001 UT App 317, ¶ 16, 37 P.3d 1180 (explaining that if "there was no actual bias in the trial judge's actions, we cannot say that trial counsel's failure to attempt to disqualify the judge constitutes" deficient performance); *see also State v. Munguia*, 2011 UT 5, ¶ 19, 253 P.3d 1082 (explaining that if the judge is not required to recuse herself, defense counsel is not ineffective for not requesting it).

CONCLUSION

¶35 We reject Lane's ineffective assistance of counsel claim and find that the judge's statements did not amount to bias requiring disqualification. But we conclude that Lane was prejudiced by the admission of the prior act evidence. The prior act evidence should have been excluded and we reverse and remand for a new trial.

———————

6. We also note that the jury, not the judge, was the factfinder in this case.

HARRIS, Judge (concurring):

¶36    I am in full agreement with the majority's analysis in this case, and specifically with its conclusion that the district court's failure to conduct a rule 403 analysis of the prior bad acts evidence was prejudicial error. I agree with the majority that, in this case, the prior bad acts evidence was deployed in such a way as to make it nearly impossible for the jury to avoid drawing a propensity inference, and that the evidence should have been excluded on that basis. I write separately, as I did recently in *State v. Murphy*, 2019 UT App 64, to again express reservations about the manner in which the doctrine of chances (the Doctrine) is currently being used in Utah.

I

¶37    My first concern is a big-picture one: I wonder whether it could ever be appropriate for the Doctrine to be applied to admit prior acts evidence to rebut a defendant's claim that he acted in self-defense. Lane does not raise this issue, but I think it would be worthwhile for a future litigant to raise it, so that a Utah appellate court can weigh in on the question after full briefing.

¶38    As described by our supreme court, the Doctrine is "a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over." *State v. Verde*, 2012 UT 60, ¶ 47, 296 P.3d 673 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *see also State v. Lopez*, 2018 UT 5, ¶ 52, 417 P.3d 116 (stating that doctrine of chances cases "involve rare events happening with unusual frequency"). At root, the Doctrine is simply "probability reasoning." *Verde*, 2012 UT 60, ¶¶ 50, 53; *cf. Hopt v. People*, 120 U.S. 430, 440 (1887) (referring to the "doctrine of chances" as a tool used to "establish a probability").

¶39 Because the Doctrine is a probability-based construct, it has been widely applied to admit prior bad acts evidence in cases in which the accused's defense is that the allegedly criminal act in question occurred by accident or random chance rather than by design. *See Murphy*, 2019 UT App 64, ¶ 54 (Harris, J., concurring) (citing cases).[7] In such cases, the prosecution may be allowed to introduce evidence of previous incidents involving the defendant in order to demonstrate the extreme statistical improbability that the allegedly criminal act occurred solely by accident or random chance. *See, e.g.*, *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) (stating that "[t]he man who wins the lottery once is envied; the one who wins it twice is investigated"), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999). That is, where the defendant's claim is that "the event in question was an accident," the Doctrine can apply to rebut that claim, as our supreme court explained in *Verde*: "Propensity inferences do not pollute this type of probability reasoning," because "[t]he question for the jury is not whether the defendant is the type of person who, for example, sets incendiary fires or murders his relatives." 2012 UT 60, ¶ 50

---

7. The defense of mistake or accident can be raised with regard to either *actus reus* or *mens rea*. In the famous "Brides in the Bath" case, the defense was that there had been no *actus reus*, and that the three brides had each died by accident while bathing. *See State v. Verde*, 2012 UT 60, ¶ 49 n.20, 296 P.3d 673 (citing *Rex v. Smith*, 11 Crim. App. 229, 84 L.J.K.B. 2153 (1915)), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. In the case of Dean Wigmore's famous hypothetical about a hunter who shot at his companion three times, the hunter necessarily concedes the existence of an *actus reus*, but defends the case on the grounds that he did not intend to shoot. *See* 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 302, at 241 (James H. Chadbourn ed., 1979). In these examples, however, the underlying defense is the same: it was a mistake or an accident.

(quotation simplified). Instead, "[t]he question is whether it is objectively likely that so many fires or deaths could be attributable to natural ca[u]ses."[8] *Id.* This evidence "tends to prove a relevant fact without relying on inferences from the defendant's character," and is therefore not impermissible propensity evidence. *Id.* ¶ 51. In the context of rebutting a claim of mistake or accident, "[i]t is that objective unlikelihood [of repeated similar misfortunes] that tends to prove" that actions were brought about by "human agency, causation, and design" rather than by accident or random chance. *Id.* ¶ 50 (quotations simplified).

¶40   A doctrine like this—based on probability reasoning and on the statistical unlikelihood of repeated occurrences of rare, random events—would seem to lose much of its logical coherence if applied in contexts where the underlying acts in question are not random at all, but instead are based on human volition. Applied in such contexts, it would seem to become very

---

8. It bears noting that the underpinnings of even this logic have been credibly (albeit impliedly, without mentioning or citing to *Verde*) called into question. *See, e.g., State v. Vuley*, 2013 VT 9, ¶¶ 19–22, 70 A.3d 940 (holding that the Doctrine cannot be used, even in its probabilistic sense, when applied to "human action" rather than to truly random events, because "[i]nferring from the implausibility of all occurrences being accidents that any particular occurrence was not an accident necessarily involves reasoning based on propensity," and that "it would be an inference based on propensity to say that, because a man has intentionally killed *a* wife, he is therefore more likely to have intentionally killed *this* wife"). For the purposes of this opinion, however, I assume that the logic of paragraphs 49–51 of the *Verde* opinion is sound (even though it may not be), and point out additional flaws in *Verde*'s rickety structure that I believe may exist even if its underlying logic is sound.

difficult—if not entirely impossible—to separate the permissible "probability" inference from the impermissible "propensity" inference. I explained in *Murphy* that I fear this problem might exist in cases in which the Doctrine is applied to admit prior bad acts for the purpose of rebutting a defendant's claim that the complaining witness is lying. *See* 2019 UT App 64, ¶¶ 57–59 (Harris, J., concurring). I see the potential for this same problem in cases in which the Doctrine is applied to admit prior bad acts for the purpose of rebutting a claim of self-defense.

¶41     In cases like this one, in which a defendant stands accused of a violent act but claims he acted in self-defense, we may be less likely to believe the defendant's claims if presented with evidence that he has made this claim before, whether successfully or unsuccessfully. But the *reason* we are less likely to credit the defendant's claim in this context has little to do with probability and a lot to do with the easily drawn inference that the defendant might be the type of person who commits violent acts. The fact that he has been previously involved in violent acts is not usually something that is based on randomness or fortune (like winning the lottery or being struck by lightning). It is based on a whole host of factors, most of which involve non-random, purposeful decisions on the part of the defendant and others. Specifically, becoming involved in violent acts involves human decision-making, and a person's state of mind when he commits those acts—e.g., whether the person acted in self-defense—is also volitional rather than random.

¶42     That is, in many instances, the reasons a person is involved in incidents resulting in violent acts, and the reasons a person forms a particular *mens rea* while doing so, are not probability-based, and therefore I wonder about the wisdom of trying to apply a probability-based doctrine in this context. The fact that Person A is much more likely than Person B to be involved in a violent scrape and then claim self-defense would seem to have a lot more to do with propensity or with other non-

random environmental factors than it does with simple mathematical probabilities. *See, e.g.*, Paul F. Rothstein, *Intellectual Coherence in an Evidence Code*, 28 Loy. L.A. L. Rev. 1259, 1262–63 (1995) ("The essence of this probable guilt argument is that there is a disparity between the chances, or probability, that an innocent person would be charged so many times and the chances, or probability, that a guilty person would be charged so many times. If there is such a disparity, however, it is only because a guilty person would have the propensity to repeat the crime. If it were not for the propensity to repeat, the chances, or the probability, that an innocent person and a guilty person would be charged repeatedly would be identical. Hence, the argument hinges on propensity and runs afoul of the first sentence of Rule 404(b)."). At a minimum, it seems that the variables involved in running a metaphorical probability calculation in this context may be too numerous to make the calculation meaningful in any given case.

¶43    In my view, even assuming the soundness of *Verde*'s underlying probability logic, *see supra* ¶ 39 note 8, and even assuming there may exist scenarios in which that logic could be usefully applied in a self-defense (or other volitional) case, the entire exercise is a nonstarter unless two threshold conditions can be met. First, the party asking the court to admit prior bad acts evidence pursuant to the Doctrine should be able to clearly articulate what the event of "rare misfortune" is that triggers the Doctrine's application. *See Verde*, 2012 UT 60, ¶ 47. Where the Doctrine is applied to rebut a claim of mistake or accident, this is usually easily accomplished: the event of rare misfortune is, say, the death of a bride in a bathtub, or the mistaken taking of a horse. *See id.* ¶¶ 48–49. In the self-defense context (as in the fabrication context, *see Murphy*, 2019 UT App 64, ¶¶ 57–59 (Harris, J., concurring)), it is often difficult to articulate what that event is, as illustrated in this case. Is the event of rare misfortune that Lane was previously involved in fights? Is it that Lane was previously involved in fights for which he claimed that he acted

in self-defense? Or is it that Lane was previously involved in fights in which he employed a knife? I cannot tell, and (even upon questioning at oral argument) neither can the State. None of these options involve random events of chance. As in this case, if it is difficult to clearly identify the event of "rare misfortune," it raises the likelihood that the evidence of prior acts is not coming in for permissible probability purposes but, instead, is coming in for impermissible propensity purposes. Moreover, without clear identification of the event of "rare misfortune," it becomes difficult to determine whether the "four foundational requirements," which are prerequisites to the application of the Doctrine, have been satisfied. *See Verde*, 2012 UT 60, ¶¶ 57–61 (listing materiality, similarity, independence, and frequency as the "four foundational requirements" of the Doctrine).

¶44    Second, the party asking the court to admit prior bad acts evidence pursuant to the Doctrine should be able to clearly articulate both (a) the purposes for which the evidence can permissibly be used and (b) the purposes for which the evidence cannot permissibly be used. If these purposes cannot be articulated in a way that a lay juror can readily understand, that is a good clue that the Doctrine is being misapplied. Again, this case is a good example. The jury was instructed that it could "consider [the prior bad acts] evidence, if at all, for the limited purpose of self-defense," but that the "evidence was not admitted to prove a character trait of the defendant or to show that he acted in a manner consistent with such a trait." I confess that I do not know what this instruction means. No mention at all is made of any probability-based inference that might be permissibly drawn with regard to evidence properly admitted pursuant to the Doctrine. No meaningful guidance is given regarding the purposes for which the evidence may, and may not, be used. I cannot imagine lay jurors having any idea what to make of an instruction like this, and if the jury is not clearly

instructed, the risk of jurors resorting to impermissible propensity inferences is too great.

¶45 All of which leads me not only to conclude that the Doctrine was misapplied in this case, but also to wonder whether the Doctrine could ever be properly applied in a self-defense context. No Utah appellate court has yet held that application of the Doctrine to cases in which the defendant claims self-defense is proper.[9] Some other courts have applied the Doctrine to allow prior acts evidence in this context, *see, e.g.*, *State v. Monroe*, 364 So. 2d 570, 571–73 (La. 1978), but those cases are rare, and it is therefore far from established that the Doctrine applies in self-defense cases. I urge parties in future cases to raise and fully brief this issue, instead of—as the parties did here—simply assuming that the Doctrine applies in this context.

II

¶46 My second set of concerns has to do with the manner in which the Doctrine was specifically applied in this case. That is,

---

9. The matter was discussed at some length in *State v. Labrum*, 2014 UT App 5, 318 P.3d 1151, but this court ultimately stopped short of deciding whether the Doctrine could be employed for this purpose because it determined that the prior bad acts evidence was admissible on another ground. *Id.* ¶¶ 29–31. To date, our supreme court has not addressed the issue, although it has generally espoused a remarkably broad view of the Doctrine's applicability, holding that it applies in other contexts also involving non-random volitional acts, including to rebut defenses of fabrication, *see Verde*, 2012 UT 60, and consent, *see State v. Lowther*, 2017 UT 34, ¶ 25, 398 P.3d 1032. For the reasons set forth herein and elsewhere, *see State v. Murphy*, 2019 UT App 64, ¶¶ 45–65 (Harris, J., concurring), my view is that these decisions may merit reexamination.

assuming that the Doctrine could be meaningfully applied to admit relevant, non-character prior acts evidence in the self-defense context, the Doctrine was misapplied in this case in several material ways.

¶47    First, as the majority ably describes, the district court did not conduct a separate rule 403 analysis, a step that is "'essential to preserve the integrity of rule 404(b).'" *See supra* ¶ 20 (quoting *Verde*, 2012 UT 60, ¶ 18). Even if a court concludes that, under governing case law, the Doctrine can logically apply, and even if it concludes that the Doctrine's "four foundational requirements" for application are met, *see Verde*, 2012 UT 60, ¶ 57, the court still must analyze the evidence under rule 403 to ascertain whether the probative value of the *admissible* part[10] of the evidence is substantially outweighed by the danger of unfair prejudice, including the danger of the jury drawing an impermissible propensity inference. The district court failed to take this important step.

¶48    Second, as I have already mentioned, the instruction given to the jury was inadequate, and did not meaningfully assist the jury in navigating its way through a logical and metaphysical minefield. "A complete, properly worded limiting

---

10. Propensity evidence has great probative value, which is in part why our rules of evidence ban it. *See* David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 1.2, at 6–7 (2009) (stating that propensity evidence is excluded "not because it has no appreciable probative value, but because it has too much"). In conducting an appropriate rule 403 balancing in this context, the "probative" side of the equation should include only the value of any admissible probability inferences, and should not include the value of any impermissible propensity inferences (which should be assessed on the "prejudice" side of the equation).

instruction has two prongs. The negative prong forbids the jury from using the evidence for the verboten purpose. In contrast, the affirmative prong explains how the jury is permitted to reason about the evidence." Edward J. Imwinkelried, *Criminal Minds: The Need to Refine the Application of the Doctrine of Objective Chances as a Justification for Introducing Uncharged Misconduct Evidence to Prove Intent*, 45 Hofstra L. Rev. 851, 873 (2017). The instruction given in this case was conclusory, and informed the jury that it could not draw a character inference but could use the evidence for "self-defense." This is precisely the sort of instruction that commentators have rightly criticized. *See id.* at 873–74, 876 (offering as an example of an "inadequate" instruction one where, "[a]fter stating the negative prong of the instruction, in the affirmative prong the judge . . . give[s] the jury only the guidance that they may use the evidence for the purpose of proving 'intent,'" and noting that this sort of instruction "can lead the jury into improper character reasoning"). Assuming that, on the facts of this case, it were possible to articulate purposes for which the evidence could and could not be used, those purposes needed to have been spelled out in much more detail than they were.

¶49   Third, I am concerned about the manner in which the district court analyzed the "frequency" factor. *See Verde*, 2012 UT 60, ¶ 61. The point of this factor is to ensure that the event of "rare misfortune" in question has been visited upon the defendant "more frequently than the typical person." *Id.* ¶¶ 47, 61 (quotation simplified). Assuming that one can pinpoint what the event of rare misfortune is in this instance, and that one can meaningfully apply probability (rather than propensity) reasoning to a situation involving several levels of human volition, our case law then requires the court to compare this defendant to a "typical person" to ascertain whether the event occurred to the defendant with greater frequency. In this case, the court's complete analysis on this point was as follows: "Here, Defendant has been involved with three serious assaults in four

years. Even given his chronic homelessness and the higher frequency of assault surrounding shelters, the rate of Defendant's involvement in these assaults is not mere accident." I find this analysis lacking. The court did not take any evidence to establish the profile of a "typical" resident of that part of Salt Lake City, or any evidence intended to establish a baseline regarding the number of physical altercations per year in which such a resident might typically be involved. Under these circumstances, I see no reasoned basis for the court's intuition-level conclusion that a person living in that part of the city becoming involved in one fight every fifteen months is necessarily "frequent." Bound up in that analysis are various assumptions by the court—arrived at without evidence—of what living conditions are like for homeless citizens of Salt Lake City. This is an instance where the court, in my view, needed to take additional evidence—from experts, if necessary—to arrive at a sound conclusion about whether the number of assaults in which Lane was involved was atypical for a resident of that part of town.

III

¶50    But I question whether our courts should even be asked to engage in inquiries like that, given the bigger problems I see with the application of the Doctrine to admit prior acts evidence in cases in which a defendant claims that he acted in self-defense. Because of my various concerns about the district court's admission, pursuant to the Doctrine, of Lane's prior assaults, I share the majority's view that Lane was not afforded a fair trial, and therefore I concur in the majority's disposition. I also urge litigants in future cases to raise and brief issues they might see with application of the Doctrine, in this or other contexts, in order to enable the Doctrine's application in Utah to be reexamined in an appropriate case.

———————